# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF GEORGIA
# SAVANNAH DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. CR412-278 |
| | ) | |
| ANTONIO TAVARIS BROWN | ) | |

## REPORT AND RECOMMENDATION

Antonio Brown is charged with the unlawful possession of a .22 caliber revolver that was seized from his residence during a warrantless search by the Savannah-Chatham Counter Narcotics Team ("CNT"). He seeks to suppress that firearm and also moves to quash the indictment. (Docs. 15, 16.) Both motions should be denied.

## I. MOTION TO SUPPRESS

Brown contends that the firearm is subject to suppression because the agents "coerced" him and his wife to consent to a search of their residence. (Doc. 15 at 1.) The credible testimony at the evidentiary hearing fails to support this contention.

After learning from a confidential informant that an individual

known as "Snag"[1] was distributing crack cocaine in the Savannah area, CNT agent Tarik Wilson arranged to have the informant make two controlled purchases of drugs from the suspect in June 2012. Both transactions were captured on audiovisual recording equipment. Agents observed Snag drive a Pontiac Grand Prix GT to the first rendezvous and a silver Hyundai Sonata to the second. They tracked both cars back to the residence located at 113 Stockbridge Drive.

On July 5, 2012, Wilson and another agent drove an unmarked pickup truck to that residence and approached the front door. Both agents were attired in plain clothes and wore yellow safety vests designed to give the impression that they were city workers of some kind. Wilson also wore a hidden microphone so that Sergeant Corey Schaff, who was located nearby with other CNT agents, could monitor his conversation. When a person later identified as Hope Harley came to the door, Agent Wilson asked whether she knew anyone by the name of Snag. When she said no, he asked her who drove the Pontiac Grand Prix. Harley then became hostile and began to curse at the agents, which caused them to

[1] The informant thought that Snag's actual name was Richard Harvey Bryant, but this turned out to be incorrect.

break off the encounter and depart.

The agents drove to a nearby convenience store and parked at a gas pump. Within a few minutes, Ms. Harley arrived in the silver Sonata, accompanied by several children. She immediately approached the pickup truck, told Wilson that she knew he was "a cop," and asked "what the fuck" he had been doing at her house. Wilson radioed his supervisor, Sgt. Schaff, who then approached Harley and explained that CNT agents were interested in the two vehicles parked at her residence because they believed that both had been used in drug deals. Harley disputed this but agreed to call her husband to come to the convenience store in order to clear things up. Brown arrived about 15 or 20 minutes later in the Grand Prix. Agent Wilson immediately recognized Brown as the individual depicted on the video recordings made during the two controlled drug transactions. When Wilson asked for Brown's identification, he produced a Georgia ID card and confessed that he did not have a driver's license. Wilson informed Brown that the Grand Prix would be towed, as it had been used in a drug transaction and Brown had no operator's license. Approximately 20 minutes passed before the tow truck arrived.

The agents explained that they would like to talk to Brown and Harley further but preferred to do so at their house. They both agreed to the request. Ms. Harley drove the Sonata back to 113 Stockbridge Drive, followed by several CNT vehicles.[2] Once there, Brown and Harley acceded to the agent's request to continue the conversation inside the residence. Either four or five agents then entered the residence, while another agent stayed outside with the children.

While seated at the kitchen table with Brown and Harley, Agent Wilson informed them that he would like to conduct a search of their residence but explained that he could not do so without their consent. He then read them a pre-printed consent form, had them each read the form, and allowed them to speak privately for a moment. They both consented to the search and signed separate consent forms that confirmed that they had

> been informed of [their] constitutional right to not have a search made of the premises . . . without a search warrant and of my right to refuse to consent to such a search. . . . This written permission is being made . . . to the above named narcotics agents voluntarily and without threats or promises of any kind being made to me.

---

[2] It is unclear from the testimony whether Brown rode with Harley or with one of the agents during the short trip from the convenience store to the residence.

(Gov't exs. A & B.) Prior to commencing the search, Wilson asked Brown whether there was anything in the house he should be aware of. Brown stated that there was an old .22 caliber revolver in a bedroom closet, as well as a digital scale. The agents retrieved the pistol from the closet, completed their search, and departed the residence without making an arrest.[3]

"'[W]here the validity of a search rests on consent, the [government] has the burden of proving that the necessary consent was obtained and that it was freely and voluntarily given, a burden that is not satisfied by showing a mere submission to a claim of lawful authority.'" *United States v. Tovar–Rico*, 61 F.3d 1529, 1536 (11th Cir. 1995) (quoting *Florida v.*

[3] The Court heard testimony from Brown and his wife that contradicted the testimony of Agents Wilson and Schaff as to matters critical to the Fourth Amendment analysis presented by this case. Most significantly, Brown and Harley testified that the CNT agents never read the consent-to-search form to them and assured them that if they refused to sign the form they would both be arrested and jailed. Ms. Harley further testified that (1) she did not curse at Agent Wilson, as she never uses profanity, (2) she was prevented from leaving the convenience store by Agent Schaff, who blocked her access to her car, (3) the agents threatened to have her car towed if she did not allow them to accompany her back to her residence, (4) the agents entered her home without being invited, and (5) the agents began to search the residence before the consent forms were signed. The Court finds this testimony to be unworthy of belief and specifically credits the testimony of the government's witnesses as to the nature and sequence of the events, the demeanor of those involved, and the overall tone of the encounter.

*Royer*, 460 U.S. 491, 497 (1983)). "'In order for consent to a search to be deemed voluntary, it must be the product of an essentially free and unconstrained choice.'" *Id.* at 1535 (quoting *United States v. Garcia*, 890 F.2d 355, 360 (11th Cir. 1989)). "The voluntariness of the consent must be judged in the light of the totality of the circumstances." *Id.* (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973)).

The totality of the circumstances here reflect that both Brown and his wife voluntarily consented to the search of their home. At no point did the agents threaten or pressure either of them into giving their consent. Nor did the agents endeavor to induce consent by promising them any benefit or favorable treatment. Instead, the agents advised them that they could refuse the request to search and made clear that absent their consent, no search would occur. As no coercive police tactics were employed, the agents did not act improperly in proceeding with the warrantless search that the defendant and his wife authorized them to conduct. The motion to suppress, therefore, should be DENIED.[4]

---

[4] While Brown suggested in his motion that he also hoped to suppress a statement that he was a middleman for drug deals (doc. 15), he never presented any evidence on that score, so the argument is deemed abandoned.

## II. MOTION TO QUASH INDICTMENT

Brown also moves to quash the indictment on the ground that the facts submitted by the government to the grand jury were false. (Doc. 16.) As a general rule, attacks on the factual underpinnings of an indictment are forbidden. As the Supreme Court has held,

> "[i]t would run counter to the whole history of the grand jury institution" to permit an indictment to be challenged "on the ground that there was inadequate or incompetent evidence before the grand jury." 350 U.S., at 363-364, 76 S. Ct., at 409. And we reaffirmed this principle recently in *Bank of Nova Scotia*, where we held that "the mere fact that evidence itself is unreliable is not sufficient to require a dismissal of the indictment," and that "a challenge to the reliability or competence of the evidence presented to the grand jury" will not be heard. 487 U.S., at 261, 108 S. Ct., at 2377.

*United States v. Williams*, 504 U.S. 36, 54-55 (1992) (alterations and omission in original; footnotes omitted). And even "the possibility that a witness may have given false testimony before the grand jury does not automatically vitiate an indictment based on that testimony; to dismiss an indictment the district court must also find an abuse of the grand jury process such as perjury or government misconduct." *United States v. DiBernardo*, 775 F.2d 1470, 1475 (11th Cir. 1985).

Here, Brown insists that an agent falsely testified before the indicting grand jury by stating that Brown had informed the agents that he was on probation and that he had a .22 caliber revolver and a set of digital scales in his residence. (Doc. 16 at 1.) Even if the agent's testimony was mistaken, Brown has not come close to showing that it was perjurious, or even that the alleged falsehoods were essential to the grand jury's probable cause finding. Since Brown has not shown the kind of misconduct necessary to call the indictment into question, his motion to quash (doc. 16) should be **DENIED**.

**SO REPORTED AND RECOMMENDED** this 16th day of April, 2013.

UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA